# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| JORDON ROUTH, derivatively on behalf of CROWDSTRIKE HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GEORGE KURTZ, BURT W. PODBERE, ROXANNE S. AUSTIN, CARY J. DAVIS, JOHANNA FLOWER, SAMEER K. GANDHI, DENIS J. O'LEARY, LAURA J. SCHUMACHER, GODFREY R. SULLIVAN, and GERHARD WATZINGER, <br><br> Defendants, <br><br> and <br><br> CROWDSTRIKE HOLDINGS, INC., <br><br> Nominal Defendant. | Case No: 1:24-cv-01031 <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jordon Routh ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant CrowdStrike Holdings, Inc. ("CrowdStrike" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants George Kurtz ("Kurtz"), Burt W. Podbere ("Podbere"), Roxanne S. Austin ("Austin"), Cary J. Davis ("Davis"), Johanna Flower ("Flower"), Sameer K. Gandhi ("Gandhi"), Denis J. O'Leary ("O'Leary"), Laura J. Schumacher ("Schumacher"), Godfrey R. Sullivan ("Sullivan"), and Gerhard Watzinger ("Watzinger") (collectively, the "Individual Defendants," and together with CrowdStrike,

- 1 -

"Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of their fiduciary duties as directors and/or officers of CrowdStrike, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CrowdStrike, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 29, 2023 to July 29, 2024, both dates inclusive (the "Relevant Period").

2.      CrowdStrike is a global cybersecurity company that claims to have "reinvented cybersecurity for the cloud era and transformed the way cybersecurity is delivered and experienced by customers."[1] The Company's customers are large corporations across various industries including airlines, banks, hospitals, and telecommunications providers as well as government

---

[1] *See* page 4 of the Form 10-K CrowdStrike filed with the SEC on March 7, 2024 ("2024 10-K").

entities.

3.     The Company purportedly focuses on designing platforms to stop data breaches. One of the Company's core offerings is the AI-native CrowdStrike Falcon XDR platform ("Falcon"), which CrowdStrike purports to be "the first, true, cloud-native platform built with artificial intelligence ('AI') at the core, capable of harnessing vast amounts of security and enterprise data to deliver highly modular solutions through a single lightweight agent."[2]

4.     According to the Company, Falcon was designed to be the "definitive platform for cybersecurity consolidation" and was built for the purpose of stopping data breaches. In the 2024 10-K, CrowdStrike represented that, "[b]y consolidating and replacing legacy point products and fragmented platforms across key areas of security and IT, the Falcon platform delivers a unified, modern approach that increases capability while reducing complexity and cost – all while stopping breaches." In particular, CrowdStrike claimed that Falcon's "single, lightweight agent collect[ed] and integrate[d] data from across the enterprise" and that the Company "use[d] this to train [CrowdStrike's] AI to detect and prevent threats and drive workflow automation to give security teams machine speed advantage to stop adversaries."[3] The Falcon software is embedded in the computers of CrowdStrike's customers and requires frequent updates.

5.     Throughout the Relevant Period, Defendants touted Falcon's efficacy and continuously assured investors that the Company's technology was "validated, tested, and certified." However, in reality, the Company had failed to adequately develop, test, and deploy its updates to Falcon, making Falcon vulnerable to bugs or errors that, as discussed below, would

---

[2] *Id.*
[3] *Id.*

eventually cause millions of computers worldwide to crash and become inoperable (the "Software Testing Misconduct").

6.    The truth began to emerge on July 19, 2024 when a single update pushed by the Company caused outages for millions of Microsoft Windows device users worldwide, including financial institutions, government entities, and corporations (the "CrowdStrike Outage"). The Company also revealed that the outages had left users vulnerable to potential hacking threats. In total, the CrowdStrike Outage caused over 8.5 million devices to go offline, with cybersecurity experts branding the CrowdStrike Outage as the "largest IT outage in history."[4] The impact of the CrowdStrike Outage on airlines and airport IT systems was particularly severe, with the flawed Falcon update delaying and cancelling thousands of flights, as airlines struggled to maintain their flight schedules due to their computer systems going offline.

7.    On this news, the price per share of CrowdStrike's stock fell $38.09, or 11%, from a closing price of $343.05 per share on July 18, 2024 to close at a price of $304.96 per share on July 19, 2024.

8.    The truth continued to come to light on July 22, 2024 when news emerged that Congress had contacted Defendant Kurtz to testify regarding the CrowdStrike Outage. The same day, analysts such as Guggenheim and BTIG downgraded CrowdStrike's stock rating. Also on July 22, 2024, *Forbes* published an article titled "The CrowdStrike Outage Is Still Impacting Airlines" which reported that "[c]ommercial airlines are still feeling the pinch days after the global CrowdStrike outage resulted in flight cancellations and travel delays ***for four consecutive days***—

---

[4] https://www.cnbc.com/2024/07/19/latest-live-updates-on-a-major-it-outage-spreading-worldwide.html

*and counting*."[5][6] The *Forbes* article also reported that "Delta Air Lines, in particular, is the U.S. carrier still experiencing the most harmful effects from the outage" and that "[a]s of the morning of July 22, FlightAware [an aviation company providing real-time flight tracking data and products] reports the airline has over 700 cancellations and 400 flight delays that will increase as the day progresses." In addition, *Forbes* revealed that, due to the CrowdStrike Outage, "multiple airlines cumulatively reported *over 46,000 delays and 5,171 cancellations on Friday, July 19, the initial day of the outage*[.]"

9.     On this news, the price per share of CrowdStrike's stock fell $41.05, or 13.5%, from a closing price of $304.96 per share on July 19, 2024 to close at $263.91 on July 22, 2024.

10.    The truth fully came to light on July 29, 2024 when news emerged that Delta Air Lines had employed renowned attorney David Boies to seek damages from CrowdStrike as a result of the CrowdStrike Outage.

11.    On this news, the price per share of CrowdStrike's stock fell $25.16, or 10%, from a closing price of $258.81 on July 29, 2024 to close at $233.65 per share on July 30, 2024.

12.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) CrowdStrike and the Individual Defendants were participating in the Software Testing

---

[5] https://www.forbes.com/sites/geoffwhitmore/2024/07/22/the-crowdstrike-outage-is-still-impacting-airlines/

[6] All emphasis has been added unless otherwise noted herein.

Misconduct; (2) due to the Software Testing Misconduct, there was a significant risk that an update to Falcon could cause major outages for a substantial portion of CrowdStrike's customers; and (3) such outages made CrowdStrike vulnerable to substantial reputational harm and legal risk, which risks eventually materialized as a result of the CrowdStrike Outage. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while five of the Individual Defendants engaged in improper insider sales, netting proceeds of ***over $195.5 million***. In further breach of their fiduciary duties, the Individual Defendants also participated in and/or facilitated the Company's participation in the Software Testing Misconduct.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities class action lawsuit pending in the United States District Court for the Western District of Texas (the "Securities Class Action"), which has subjected the Company to two consumer class action lawsuits pending in the United States District Court for the Western District of Texas (the "Consumer Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to remedy the Software Testing Misconduct, the need to implement adequate internal controls, losses from the waste of corporate assets, losses due to the CrowdStrike Outage, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's engagement in the Software Testing Misconduct, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Kurtz's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of CrowdStrike. Plaintiff has continuously held CrowdStrike common stock since first purchasing the stock on March 5, 2021.

### Nominal Defendant CrowdStrike

22.     Nominal Defendant CrowdStrike is a Delaware corporation with its principal executive offices at 206 E. 9th Street, Suite 1400, Austin, Texas, 78701. CrowdStrike's common stock trades on the Nasdaq Stock Market LLC ("NASDAQ") under ticker symbol "CRWD."

### Defendant Kurtz

23.     Defendant Kurtz has served as CrowdStrike's President, CEO, and as a Company director since November 2011. He also serves as a member of the Transaction Committee. According to the Schedule 14A the Company filed with the SEC on May 6, 2024 (the "2024 Proxy Statement"), as of April 18, 2024, Defendant Kurtz owned 1,374,595 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Kurtz owned approximately $404.3 million worth of CrowdStrike Class A common stock as of that date.

24.     For the fiscal year ended January 31, 2024 (the "2024 Fiscal Year"), Defendant Kurtz received $46,983,855 in total compensation from the Company. This included $950,000 in salary, $44,090,037 in stock awards, $1,241,709 in non-equity incentive plan compensation, and

$702,109 in all other compensation.

25.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Kurtz made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 21, 2023 | 56,985 | $252.94 | $14,413,842 |
| January 11, 2024 | 60,000 | $283.16 | $16,989,540 |
| January 12, 2024 | 40,000 | $286.10 | $11,443,960 |
| March 21, 2024 | 78,080 | $328.38 | $25,639,910 |
| May 3, 2024 | 56,279 | $303.57 | $17,084,897 |
| June 21, 2024 | 55,587 | $376.16 | $20,909,717 |

Thus, in total, before the fraud was exposed, he sold 346,931 shares of Company stock on inside information, for which he received approximately $106.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

26.    The 2024 Proxy Statement stated the following about Defendant Kurtz:

Mr. Kurtz, 53, is one of our co-founders and has served as our Chief Executive Officer, President and a member of our board of directors since November 2011.
➢ From October 2004 to October 2011, Mr. Kurtz served in executive roles at McAfee, Inc., a security technology company, including as Executive Vice President and Worldwide Chief Technology Officer from October 2009 to October 2011.
➢ In October 1999, Mr. Kurtz founded Foundstone, Inc., a security technology company, where he served as its Chief Executive Officer until it was acquired by McAfee, Inc. in October 2004.
➢ Since November 2017, he has also served as Chairman and as a board member for the CrowdStrike Foundation, a nonprofit established to support the next generation of talent and research in cybersecurity and artificial intelligence through scholarships, grants, and other activities.
➢ He served on the board of directors of Hewlett Packard Enterprise, an enterprise information technology company from June 2019 until April 2023.

**Defendant Podbere**

27.    Defendant Podbere has served as CrowdStrike's CFO since September 2015. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Podbere owned 133,023 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Podbere owned approximately $39.1 million worth of CrowdStrike Class A common stock as of that date.

28.    For the 2024 Fiscal Year, Defendant Podbere received $20,206,385 in total compensation from the Company. This included $625,000 in salary, $18,895,730 in stock awards, $653,531 in non-equity incentive plan compensation, and $32,124 in all other compensation.

29.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Podbere made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 12, 2023 | 41,240 | $250.04 | $10,311,732 |
| December 21, 2023 | 22,825 | $253.49 | $5,785,886 |
| March 21, 2024 | 26,097 | $325.90 | $8,505,116 |
| April 1, 2024 | 64,000 | $317.18 | $20,299,776 |
| May 3, 2024 | 15,753 | $304.24 | $4,792,661 |
| May 14, 2024 | 12,000 | $329.10 | $3,949,152 |
| May 15, 2024 | 12,000 | $339.29 | $4,071,503 |
| May 20, 2024 | 5,424 | $349.01 | $1,893,030 |
| May 21, 2024 | 6,576 | $348.94 | $2,294,629 |
| June 21, 2024 | 11,154 | $377.21 | $4,207,456 |

Thus, in total, before the fraud was exposed, he sold 217,069 shares of Company stock on inside information, for which he received approximately $66.1 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

30.    The Company's website states the following about Defendant Podbere:

Burt Podbere serves as the Chief Financial Officer (CFO) for CrowdStrike. Since joining the company, Mr. Podbere has been instrumental in establishing the company's long-term financial management strategy and developing the company's global expansion strategy.

Since joining CrowdStrike in 2015, he has helped secure approximately $1B in equity financing through several funding rounds, including the company's 2019 IPO, and approximately $1.5B in secured and unsecured debt.

Mr. Podbere has worked in Canada, Europe, and the U.S., garnering extensive knowledge of domestic and international finance, SaaS businesses, and international operations.

### Defendant Austin

31.    Defendant Austin has served as a Company director since September 2018. She also serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Austin owned 15,919 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Austin owned approximately $4.7 million worth of CrowdStrike Class A common stock as of that date.

32.    For the 2024 Fiscal Year, Defendant Austin received $334,668 in total compensation from the Company. This included $65,000 in fees earned or paid in cash, $249,867 in stock awards, and $19,801 in all other compensation.

33.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Austin made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| June 27, 2024 | 10,000 | $390.01 | $3,900,100 |
| June 28, 2024 | 5,000 | $391.01 | $1,955,050 |

Thus, in total, before the fraud was exposed, she sold 15,000 shares of Company stock on inside information, for which she received approximately $5.9 million in proceeds. Her insider sales,

made with knowledge of material nonpublic information before the material misstatements and

omissions were exposed, demonstrate her motive in facilitating and participating in the schemes.

34.    The 2024 Proxy Statement stated the following about Defendant Austin:

Ms. Austin, 63, has served on our board of directors since September 2018.
➢Ms. Austin has served as President of Austin Investment Advisors, a private
investment and consulting firm, since January 2004. Ms. Austin also served as chair
of the U.S. Mid-Market Investment Advisory Committee of EQT Partners, a private
equity group, from 2017 – 2023.
➢Ms. Austin currently serves on the boards of directors of AbbVie Inc., a
biopharmaceutical company; Freshworks, Inc., a provider of modern Software-as-a-
Service products; and Verizon Communications, a telecommunications company.
➢She previously served on the board of directors of Abbott Laboratories, a provider
of pharmaceuticals, medical devices and nutritional products; Teledyne
Technologies Incorporated, an industrial conglomerate; LM Ericsson Telephone
Company, a networking and telecommunications company; and Target Corporation,
a department store retailer.

### **Defendant Davis**

35.    Defendant Davis has served as a Company director since July 2013. He also serves

as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April

18, 2024, Defendant Davis owned 18,418 shares of the Company's Class A common stock. Given

that the price per share of the Company's Class A common stock at the close of trading on April

18, 2024 was $294.10, Defendant Davis owned approximately $5.4 million worth of CrowdStrike

Class A common stock as of that date.

36.    For the 2024 Fiscal Year, Defendant Davis received $299,367 in total compensation

from the Company. This included $49,500 in fees earned or paid in cash and $249,867 in stock

awards.

37.    The 2024 Proxy Statement stated the following about Defendant Davis:

Mr. Davis, 57, has served on our board of directors since July 2013.

➤Mr. Davis is a Managing Director at Warburg Pincus, which he joined in October 1994, where he focuses on investments in the software and financial technology sectors.

➤Prior to joining Warburg Pincus, he was Executive Assistant to Michael Dell at Dell Inc., a multinational computer technology company, and a consultant at McKinsey & Company, a worldwide management consulting firm.

➤Mr. Davis currently serves on the boards of directors of Clearwater Analytics Holdings, Inc., a Software-as-a-Service investment data platform company, and several privately held companies.

➤Mr. Davis previously served on the board of directors of Cyren, a cybersecurity company.

**Defendant Flower**

38.    Defendant Flower has served as a Company director since January 2023. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Flower owned 80,883 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Flower owned approximately $23.8 million worth of CrowdStrike Class A common stock as of that date.

39.    For the 2024 Fiscal Year, Defendant Flower received $315,927 in total compensation from the Company. This included $40,000 in fees earned or paid in cash, $249,867 in stock awards, and $26,060 in all other compensation.

40.    The 2024 Proxy Statement stated the following about Defendant Flower:

Ms. Flower, 49, has served on our board of directors since January 2023.

➤From January 2022 to November 2022, Ms. Flower served as CrowdStrike's Chief Marketing Officer, a role she previously held from November 2014 to August 2020.

➤From June 2000 to June 2014, Ms. Flower served in various executive roles at Websense Inc., a cybersecurity software company now known as Forcepoint, LLC, where she served most recently as Senior Vice President and Chief Marketing Officer.

➤Ms. Flower currently serves on the board of directors of Freshworks, Inc., a provider of modern Software-as-a-Service products, and several privately held

- 13 -

companies.

➢Ms. Flower previously served on the board of directors of ForgeRock, Inc., a digital identity technology company.

**Defendant Gandhi**

41.    Defendant Gandhi has served as a Company director since August 2013. He also serves as Chair of the Compensation Committee and as a member of the Transaction Committee. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Gandhi owned 910,641 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Gandhi owned approximately $267.8 million worth of CrowdStrike Class A common stock as of that date.

42.    For the 2024 Fiscal Year, Defendant Gandhi received $309,450 in total compensation from the Company. This included $59,583 in fees earned or paid in cash and $249,867 in stock awards.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Gandhi made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| January 3, 2024 | 15,000 | $240.13 | $3,601,995 |
| April 3, 2024 | 15,000 | $317.18 | $4,757,625 |
| July 1, 2024 | 15,000 | $382.02 | $5,730,285 |

Thus, in total, before the fraud was exposed, he sold 45,000 shares of Company stock on inside information, for which he received approximately $14.1 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

44.    The 2024 Proxy Statement stated the following about Defendant Gandhi:

Mr. Gandhi, 58, has served on our board of directors since August 2013.
➢ Mr. Gandhi is currently a partner at Accel, a venture capital firm he joined in June 2008, focusing on consumer, cloud/SaaS and media companies.
➢ He is responsible for Accel's investments in Spotify, Dropbox, Flipkart and Venmo, among others throughout his 25 years of investing.
➢ Mr. Gandhi currently serves on the board of Freshworks, Inc., a provider of modern Software-as-a-Service products, as well as on the boards of several privately held companies.

**Defendant O'Leary**

45.    Defendant O'Leary has served as a Company director since December 2011. He also serves as Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant O'Leary owned 12,656 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant O'Leary owned approximately $3.7 million worth of CrowdStrike Class A common stock as of that date.

46.    For the 2024 Fiscal Year, Defendant O'Leary received $299,867 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $249,867 in stock awards.

47.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant O'Leary made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| December 7, 2023 | 4,040 | $238.40 | $963,136 |
| June 10, 2024 | 5,300 | $381.45 | $2,021,685 |

Thus, in total, before the fraud was exposed, he sold 9,340 shares of Company stock on inside

information, for which he received approximately $3 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

48.    The 2024 Proxy Statement stated the following about Defendant O'Leary:

Mr. O'Leary, 67, has served on our board of directors since December 2011.
➢Mr. O'Leary has been a private investor since January 2016.
➢From September 2009 to February 2016, he served as co-managing partner of Encore Financial Partners, Inc., a company focused on the acquisition and management of banking organizations.
➢From June 1978 to April 2003, Mr. O'Leary was with JPM Chase & Co., an investment bank and financial services company, where he served in various executive roles, including Corporate Treasurer, CIO, and Head of Retail and Small Business Banking.
➢Mr. O'Leary previously served as a director and chairman of the board of directors of Fiserv, Inc., a public provider of financial services technology and as a member of the board of directors of Ventiv, Inc., a privately held software company.

**Defendant Schumacher**

49.    Defendant Schumacher has served as a Company director since November 2020. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Schumacher owned 6,041 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Schumacher owned approximately $1.8 million worth of CrowdStrike Class A common stock as of that date.

50.    For the 2024 Fiscal Year, Defendant Schumacher received $294,867 in total compensation from the Company. This included $45,000 in fees earned or paid in cash and $249,867 in stock awards.

51.    The 2024 Proxy Statement stated the following about Defendant Schumacher:

Ms. Schumacher, 60, has served on our board of directors since November 2020.
➢ From December 2018 to December 2022, Ms. Schumacher served as the Vice Chairman, External Affairs and Chief Legal Officer of AbbVie, Inc.
➢ Prior to that, Ms. Schumacher served as Executive Vice President, External Affairs, General Counsel and Corporate Secretary of AbbVie, Inc.
➢ Prior to AbbVie's separation from Abbott Laboratories, Ms. Schumacher served in various leadership positions at Abbott, including as Executive Vice President, General Counsel from 2007 to 2012.
➢ Ms. Schumacher currently serves on the board of directors of General Dynamics Corporation, a global aerospace and defense company; the Board of Trustees for Ronald McDonald House Charities; and the Notre Dame College of Science Advisory Board.

### **Defendant Sullivan**

52.     Defendant Sullivan has served as a Company director since December 2017. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Sullivan owned 78,887 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Sullivan owned approximately $23.2 million worth of CrowdStrike Class A common stock as of that date.

53.     For the 2024 Fiscal Year, Defendant Sullivan received $299,867 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $249,867 in stock awards.

54.     The 2024 Proxy Statement stated the following about Defendant Sullivan:

Mr. Sullivan, 70, has served on our board of directors since December 2017.
➢ From September 2008 to November 2015, he served as President and Chief Executive Officer of Splunk, Inc., a provider of machine data analytics software, and served on the board of directors of Splunk, Inc. from 2011 to 2019.
➢ From 2001 to 2004 he served as President and Chief Operating Officer, and from 2004 to 2007 as President, Chief Executive Officer and a member of the board of directors of Hyperion Solutions, an enterprise financial analytics company.

➢Mr. Sullivan currently serves on the board of directors of Marqeta, Inc., a modern card issuing company and GitLab, Inc., a DevOps software company.

➢He previously served on the board of directors of Citrix Systems, Inc., an enterprise software company; Informatica Corporation, an enterprise data management company; People.ai, a privately held AI revenue intelligence platform company; and RingCentral, Inc., a provider of cloud-based communications and collaboration solutions.

**Defendant Watzinger**

55.     Defendant Watzinger has served as a Company director since April 2012. He also serves as a member of the Audit Committee, Nominating and Corporate Governance Committee, and Transaction Committee. According to the 2024 Proxy Statement, as of April 18, 2024, Defendant Watzinger owned 53,990 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2024 was $294.10, Defendant Watzinger owned approximately $15.9 million worth of CrowdStrike Class A common stock as of that date.

56.     For the 2024 Fiscal Year, Defendant Watzinger received $374,668 in total compensation from the Company. This included $105,000 in fees earned or paid in cash, $249,867 in stock awards, and $19,801 in all other compensation.

57.     The 2024 Proxy Statement stated the following about Defendant Watzinger:

Mr. Watzinger, 63, has served as Chairman of our board of directors since April 2012.

➢From April 2013 to September 2013, he served as the Chief Executive Officer for IGATE Corporation, an IT services company.

➢Mr. Watzinger served as the Executive Vice President for Corporate Strategy and Mergers & Acquisitions of the McAfee business unit of Intel Corporation ("Intel") a designer and manufacturer of digital technology platforms, until his resignation in March 2012.

➢Mr. Watzinger joined Intel in February 2011 upon Intel's acquisition of McAfee.

➢Mr. Watzinger joined McAfee in November 2007 upon McAfee's acquisition of SafeBoot Corporation, a global leader in data protection software, where he served

as Chief Executive Officer from February 2004 to November 2007.

➢He currently serves on the board of directors of Mastech Digital, Inc., a digital transformation and information technology services company; Invicti Security, an application security company and NinjaOne, an IT management company.

➢He previously served on the board of directors of KnowBe4, Inc., a security awareness technology company, and Absolute Software Corporation, a persistent software company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

59.     Each director and/or officer of the Company owes to CrowdStrike and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

61.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at CrowdStrike had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

63.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to CrowdStrike's own Code of Ethics & Business Conduct (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

65.    At all times relevant hereto, the Individual Defendants at CrowdStrike were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

66.    Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

67.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

68.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

69.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

70.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of CrowdStrike's board of directors, each of the Individual Defendants who was a director of CrowdStrike was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## CROWDSTRIKE'S CODE OF ETHICS

### Code of Ethics

73.    CrowdStrike's Code of Ethics applies to "all employees, officers, Board members

and independent contractors" at CrowdStrike. Additionally, the Code of Ethics "describes CrowdStrike's core values and its expectations for how [employees] act when conducting business on CrowdStrike's behalf."

74.    Under the heading "Financial Integrity, Records, and Accounting" the Code of Ethics states the following, in relevant part:

> Making false or misleading records or documentation is strictly prohibited.
>
> All of CrowdStrike's books, records, accounts and financial statements must be:
>
> - maintained in reasonable detail.
>
> - must accurately, fairly and completely reflect the transactions and matters to which they relate.
>
> - must conform both to applicable legal requirements and to CrowdStrike's system of internal controls. Unrecorded funds or assets should not be maintained.

75.    Under the heading "Safeguarding Confidential Information," the Code of Ethics states the following, in relevant part:

> CrowdStrikers must protect CrowdStrike's confidential information and the confidential information entrusted to us by our customers, partners, and suppliers.
>
> Your duty to safeguard confidential information continues after your relationship with CrowdStrike ends.
>
> * * *
>
> Protecting confidential information means only sharing information with other CrowdStrikers on a need-to-know basis, and not disclosing it to others outside of CrowdStrike except as strictly necessary to carry out a business purpose and under nondisclosure agreements or subject to a duty of confidentiality.
>
> Confidential information should not be shared with your family or friends.

76.    Under the heading "Conflicts of Interest," the Code of Ethics states the following:

CrowdStrikers are expected to act, at all times and in all ways, in the best interest of CrowdStrike while performing their job duties.

This means CrowdStrikers must avoid conflicts of interest.

Potential conflicts of interest are not uncommon or necessarily prohibited.

What is a "conflict of interest"? A "conflict of interest" occurs when a CrowdStriker's ability to perform his or her job responsibilities or duties for CrowdStrike are impacted by personal interests or the interests of a third party. These competing interests may limit the ability to perform the job objectively and without bias.

77.     Under the heading "Insider Trading," the Code of Ethics states the following:

Insider trading violates this Code and the law, and may result in substantial civil and criminal penalties, including the possibility of a jail sentence.

Buying or selling stock while in possession of material non-public information or passing such information along to others so that they may buy or sell stock, constitutes illegal insider trading.

CrowdStrike shares non-public information with CrowdStrikers to successfully carry out our business. You may also inadvertently learn non-public information – for example by overhearing a conversation.

78.     Under the heading "Honest and Ethical Conduct," the Code of Ethics states the following:

Consistent with our core values, you must act and perform your duties ethically, honestly and with integrity.

We do the right thing even when "no one is looking."

We are honest and trustworthy in our dealings with partners, customers, vendors and other third parties. We must only enter into agreements on behalf of CrowdStrike that contain terms which CrowdStrike can honor. No winks. No nods.

### *Corporate Governance Guidelines*

79.     CrowdStrike represents that its Corporate Governance Guidelines were adopted

"to promote the effective functioning of the Board and its committees, to promote the interests of

- 25 -

stockholders, and to ensure a common set of expectations as to how the Board, its various committees, individual directors, and management should perform their functions."

80.     Under the heading "Director Responsibilities," the Corporate Governance Guidelines state:

> The Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company. In fulfilling this role, each director must act in what he or she reasonably believes to be in the best interests of the Company and must exercise his or her business judgment.

81.     Under a section titled "Board Committees," the Corporate Governance Guidelines describe the role of the Audit Committee as:

> the Audit Committee shall generally be responsible for overseeing the integrity of the Company's financial statements, its independent auditor, its internal audit function and compliance by the Company with legal and regulatory requirements, and overseeing the Company's Policy for Reporting Concerns to Accounting, Auditing and Ethical Violations (Whistleblower Policy).

82.     In violation of the Code of Ethics and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Software Testing Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

## CROWDSTRIKE'S AUDIT COMMITTEE CHARTER

83.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> The Audit Committee (the "Committee") was created by the Board of Directors (the "Board") to:
>
> - assist the Board in its oversight of:
>
>   - the integrity of the Company's financial statements and internal controls;
>
>   - the qualifications, independence and performance of the Company's independent auditor;
>
>   - the performance of the Company's internal audit function;
>
>   - the Company's compliance with legal and regulatory requirements; and
>
> - prepare the Committee report that the Securities and Exchange Commission (the "SEC") rules require to be included in the Company's annual proxy statement.

84.     The Audit Committee Charter, under the heading "Responsibilities," states that:

> The basic responsibility of the members of the Committee is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders. In discharging that obligation, members should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors, to the fullest extent permitted by law. In addition to any other responsibilities which may be assigned from time to time by the Board, the Committee is responsible for the following matters."

85.     Under the same heading, in the subsection titled "*Independent Auditor*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

> - The Committee shall be directly responsible for the appointment, compensation, retention, termination, and oversight of the work of any

accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (subject, if applicable, to shareholder ratification). Each such accounting firm shall report directly to the Committee.

- The Committee shall pre-approve the audit services and non-audit services (including the fees and terms thereof) to be provided by the Company's independent auditor pursuant to pre-approval policies and procedures established by the Committee, subject to the de minimis exception for non-audit services described in the Securities Exchange Act of 1934 that are approved by the Committee prior to the completion of the audit. The Committee may delegate its authority to pre-approve services to the Committee Chair, or one or more Committee members, provided that such designees present any such approvals to the full Committee at the next Committee meeting.

- The Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and approve the planned scope and timing of the independent auditor's annual audit plan(s) and discuss significant findings from the audit and any problems or difficulties encountered, including any restrictions on the scope of the auditor's activities or on access to requested information, and any significant disagreements with management.

- The Committee shall evaluate the independent auditor's qualifications, performance and independence, and shall present its conclusions with respect to the independent auditor to the full Board on at least an annual basis. As part of such evaluation, at least annually, the Committee shall:

    o obtain and review a report or reports from the Company's independent auditor:

        ▪ describing the independent auditor's internal quality-control procedures;

        ▪ describing any material issues raised by (i) the most recent internal quality-control review, peer review or Public Company Accounting Oversight Board ("PCAOB") review, of the independent auditing firm, or (ii) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the auditing firm; and any steps taken to deal with any such issues; and

- describing all relationships between the independent auditor and the Company consistent with applicable requirements of the PCAOB regarding the independent auditor's communications with the Committee concerning independence;

  o consider whether the provision of permitted non-audit services is compatible with maintaining the independent auditor's independence;

  o review and evaluate the lead audit partner of the independent auditor team(s), as well as other senior members;

  o confirm and evaluate the rotation of the audit partners on the audit engagement team as required by law;

  o consider whether the independent auditor should be rotated, so as to assure continuing auditor independence; and

  o obtain the opinion of management and the Company personnel primarily responsible for the design and implementation of the internal audit function of the independent auditor's performance.

- The Committee shall establish policies for the Company's hiring of current or former employees of the independent auditor.

86.     Under the same heading, in the subsection titled "*Financial Statements; Disclosure and Other Risk Management and Compliance Matters*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall meet to review and discuss with management and the independent auditor the annual audited financial statements and unaudited quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Form 10-K or Form 10-Q with the SEC;

- The Committee shall review with management, the head of internal audit, and the independent auditor, whenever the Committee deems appropriate:

  o any analyses or other written communications prepared by management and/or the independent auditor setting forth significant

financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative U.S. Generally Accepted Accounting Principles ("GAAP") methods on the financial statements;

o   the critical accounting policies and practices of the Company;

o   the effect of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the Company's financial statements; and

o   any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- The Committee, or the Chair of the Committee, shall review the Company's earnings press releases prior to public dissemination, the type and presentation of information included in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, paying particular attention to the use of non-GAAP financial information.

- The Committee, or the Chair of the Committee, may review any of the Company's financial information and earnings guidance provided to analysts and ratings agencies and any of the Company's other financial disclosures, such as earnings press releases, as the Chair of the Committee deems appropriate.

- The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, review the Company's disclosure controls and procedures and internal control over financial reporting. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

- The Committee shall review and discuss with the independent auditor and management any current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

- The Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the auditor pursuant to established auditing standards, as amended, such as:

  o any restrictions on the scope of the independent auditor's activities or on access to requested information;

  any accounting adjustments that were noted or proposed by the auditor but were not adopted or reflected;

  any communications between the audit team and the audit firm's national office regarding auditing or accounting issues presented by the engagement;

  any management or internal control letter issued, or proposed to be issued, by the auditor; and

  o any significant disagreements between management and the independent auditor.

- In connection with its oversight responsibilities, the Committee shall be directly responsible for the resolution of disagreements between management and the auditor regarding the Company's financial reporting.

- The Committee shall review the Company's policies and practices with respect to risk assessment and risk management, including the Company's policies and practices pertaining to financial accounting, investment, tax, and cybersecurity matters, and shall discuss with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures.

- The Committee shall establish procedures for:

  o the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and

  o the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- The Committee shall prepare the Committee report that the SEC rules require to be included in the Company's annual proxy statement.

- 31 -

- The Committee shall review the Company's compliance with laws and regulations, including major legal and regulatory initiatives. The Committee shall also review any major litigation or investigations against the Company that may have a material impact on the Company's financial statements. The Committee shall meet and discuss these matters with management and others as appropriate, including the General Counsel of the Company.

87.    Under the same heading, in the subsection titled "*Internal Audit Function*," the

Audit Committee Charter states that the responsibilities of the Committee as follows:

- The Committee shall review any process of appointment and/or replacement of the Company's head of internal audit.

- At least annually, the Committee shall evaluate the responsibilities, budget, staffing, planned scope of work, and performance of the internal audit function. Such review shall include a review of the responsibilities, budget and staffing of the Company's internal audit function with the independent auditor.

- The Committee shall review any significant results of internal audits, recommendations prepared by the internal auditing department and management's responses thereto.

88.    Under the same heading, in the subsection titled "*Reporting to the Board*," the

Audit Committee Charter states that the responsibilities of the Committee are as follows:

- The Committee shall report to the Board periodically. This report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the independence and performance of the Company's independent auditor, the performance of the internal audit function, and any other matters that the Committee deems appropriate or is requested to include by the Board.

- At least annually, the Committee shall evaluate its own performance and report to the Board on such evaluation.

- The Committee shall review and assess the adequacy of this charter annually and recommend any proposed changes to the Board.

89.    Under the same heading, in the subsection titled "*Corporate Governance Matters*,"

the Audit Committee Charter states that the responsibilities of the Committee as follows:

- The Committee may revise or amend the Policy for Reporting Concerns Related to Accounting, Auditing and Ethical Violations (Whistleblower Policy) as appropriate.

- The Committee shall review, and if appropriate, approve related party transactions in accordance with the Company's Related Person Transaction Policy.

90.      In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to participate in the Software Testing Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

91.      CrowdStrike is a global cybersecurity company that claims to have "reinvented cybersecurity for the cloud era and transformed the way cybersecurity is delivered and experienced by customers."[7] The Company's customers are large corporations across various industries

---

[7] *See* page 4 of the 2024 10-K.

including airlines, banks, hospitals, and telecommunications providers as well as government entities.

92.     The Company purportedly focuses on designing platforms to stop data breaches. One of the Company's core offerings is the Falcon platform, which CrowdStrike purports to be "the first, true, cloud-native platform built with artificial intelligence ('AI') at the core, capable of harnessing vast amounts of security and enterprise data to deliver highly modular solutions through a single lightweight agent."[8]

93.     According to the Company, Falcon was designed to be the "definitive platform for cybersecurity consolidation" and was built for the purpose of stopping data breaches. In the 2024 10-K, CrowdStrike represented that, "[b]y consolidating and replacing legacy point products and fragmented platforms across key areas of security and IT, the Falcon platform delivers a unified, modern approach that increases capability while reducing complexity and cost – all while stopping breaches." In particular, CrowdStrike claimed that Falcon's "single, lightweight agent collect[ed] and integrate[d] data from across the enterprise" and that the Company "use[d] this to train [CrowdStrike's] AI to detect and prevent threats and drive workflow automation to give security teams machine speed advantage to stop adversaries."[9]

94.     The Falcon software is embedded in the computers of the Company's customers and requires frequent updates. The Company updates its Falcon platform in the following two ways, at least: (1) through "Sensor Content" updates that directly update Falcon's sensor; and (2) through "Rapid Response Content" updates that update how those sensors behave in attempting to

---

[8] *Id.*
[9] *Id.*

identify threats. As an automated cloud-based software, Falcon "follows a common practice of continuous integration and continuous delivery, [] such that software updates are deployed at once for many customers at scale."[10]

**The Software Testing Misconduct**

***The CrowdStrike Outage***

95.     Shortly after midnight on the morning of July 19, 2024, the Company distributed a flawed content update for Falcon, specifically in the program's Rapid Response Content file, which caused severe worldwide technology outages for millions of devices using Microsoft Windows. Due to the fact that Falcon is an endpoint system, the Company had simultaneously pushed the update to thousands of separate computer endpoints. The update contained a defective data file, which caused an out-of-bounds exception in the Windows software. Together, the Company's defect and out-of-bounds exception crashed numerous computer endpoints.

96.     Soon after the update was pushed, the Company made efforts to roll it back, but by that point, the damage had already been done, with the flawed update causing affected computers to shut down and endlessly, but unsuccessfully, try to reboot. Due to the system crashes, users' computers depicted Windows' blue warning screen, frequently referred to as the "Blue Screen of Death." Matters were worsened by the fact that each endpoint needed to be restarted by manual intervention.

97.     The CrowdStrike Outage impacted approximately 8.5 million Windows devices and was characterized by many as the largest IT outage in history. Victims of the outage included both government entities and large corporations. Due to the outage, airlines were forced to ground

---

[10] https://www.cybersecuritydive.com/news/crowdstrike-flawed-update-78-minutes/722070/

numerous flights, and emergency 911 hotlines were inoperable, among other consequences. The outage also impacted hospitals, with one claiming that 15,000 of its servers crashed, affecting 40,000 of its 150,000 computers.[11]

98.    The same day, CrowdStrike published a blog post on its website titled "Our Statement on Today's Outage" where Defendant Kurtz stated, "I want to sincerely apologize directly to all of you for today's outage. All of CrowdStrike understands the gravity and impact of the situation."[12] In addition, the Company warned the public that bad actors were attempting to exploit the CrowdStrike Outage as a means of hacking Company customers, with Defendant Kurtz admitting in the blog post that "*[w]e know that adversaries and bad actors will try to exploit events like this.* I encourage everyone to remain vigilant and ensure that you're engaging with official CrowdStrike representatives. Our blog and technical support will continue to be the official channels for the latest updates."

99.    Two leaders of Congress's Homeland Security Committee, in a letter to Defendant Kurtz, underscored the gravity of the situation, emphasizing that "*[i]n less than one day, we have seen major impacts to key functions of the global economy, including aviation, healthcare, banking, media, and emergency services*."[13]

**The Impact of the CrowdStrike Outage on Delta Airlines**

100.   The CrowdStrike Outage severely impacted Delta Airlines in particular, with the airline canceling more than 5,000 flights between the onset of the outage on July 19, 2024, and

---

[11] https://www.nytimes.com/2024/07/19/business/microsoft-outage-cause-azure-crowdstrike.html

[12] https://www.crowdstrike.com/blog/to-our-customers-and-partners/

[13] https://homeland.house.gov/wp-content/uploads/2024/07/CrowdStrike-Software-Update-Letter_FINAL.pdf

July 25, 2024. As a result of the outage, Delta's crew-tracking system was disabled, thereby keeping it from being able to locate pilots and flight attendants to reschedule flights; this crew tracking system continued to experience problems even after Delta's systems began running again. The airline was forced to manually repair over 1,500 systems that had crashed and gone offline; Delta's IT team also manually reset 40,000 servers impacted by the CrowdStrike Outage.[14]

101.    The impacts of the CrowdStrike Outage were felt by Delta's customers even after other airlines were able to continue with their usual operations, with approximately 500,000 customers left stranded in airports nationwide while the airline's flights experienced repeated delays and eventual cancellations.[15]

102.    Delta estimates that the CrowdStrike Outage "caused a $380 million revenue hit related to refunding customers for their initial flight costs and also providing them with cash and SkyMiles" and further caused Delta to "spen[d] about $170 million on other recovery expenses, including those tied to operational needs of reimbursing customers and helping crew members affected by flight cancellations."[16]

### The Company Was Aware of the Risks of a Software Error with Falcon

103.    During the Relevant Period, Defendants knew, or should have known, that failing to put into place reasonable procedures for software development, testing, and validation processes, procedures, or controls would put the Company at serious risk of publishing and disseminating a software update containing severe flaws, invalid data, or bugs. In addition, Defendants knew or should have known that creating and disseminating an update with serious

---

[14] https://www.ciodive.com/news/delta-crowdstrike-outage-costs/722970/
[15] https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html
[16] https://www.axios.com/2024/08/08/delta-crowdstrike-outage-cost-550-million

flaws or bugs would inevitably cause a severe and widespread outage of CrowdStrike's customers' computer systems. Moreover, at all relevant times, CrowdStrike failed to perform smaller scale testing on the Falcon update, meaning that if the update contained any errors or bugs, the faulty update would crash **all of the Company's customers' systems at once**.

104.    In a discussion with CNBC following the CrowdStrike Outage, former FBI counterterrorism and counterintelligence operative and cybersecurity expert Eric O'Neill ("O'Neill") highlighted CrowdStrike's shortcomings with respect to its software updates, stating "**[w]hat Crowdstrike was doing was rolling out its updates to everyone at once. That is not the best idea.** Send it to one group and test it. **There are levels of quality control it should go through[.]**"[17] Similarly, Peter Avery ("Avery"), vice president of security and compliance at Visual Edge IT, explained to CNBC that the Falcon update "should have been tested in sandboxes, **in many environments before it went out**."[18] Avery continued, stating "[y]ou need the right checks and balances in companies. It could have been a single person that decided to push this update, or somebody picked the wrong file to execute on[.]"[19]

105.    Similarly, in a *CSOOnline.com* article about the CrowdStrike Outage published on July 29, 2024, principal test strategist at Sauce Labs, Marcus Merrell, explained that "[e]verything is software and software is everything - it's more interconnected and interdependent than ever . . . If the software update release going out there affects not just your users but your users' users, **you must slow-roll the release over a period of hours or days, rather than risk crippling the entire**

---

[17] https://www.cnbc.com/2024/07/20/the-crowdstrike-fail-and-next-global-it-meltdown-already-in-the-making.html
[18] *Id.*
[19] *Id.*

***planet with one large update***."[20]

106.    The Company also repeatedly admitted in its filings with the SEC that the Company faced risks that product enhancements "may have quality or other defects or deficiencies"; that "[b]ecause [CrowdStrike's] cloud native security platform is complex, it may contain defects or errors that are not detected until after deployment"; and that "errors, defects or performance problems in [CrowdStrike's] software" and "improper deployment or configuration of our solutions" could affect the delivery, availability, and performance of its Falcon platform."[21] In addition, CrowdStrike admitted in the 2024 10-K that "adverse effects of any service interruptions . . . may be disproportionately heightened due to the nature of [its] business and the fact that [its] customers have a low tolerance for interruptions of any duration." The Company had also experienced a similar issue with its updates in April 2024, when it pushed out a software update to Linux operating system customers that also caused computers to crash; it took the Company nearly five days to resolve that outage, meaning that CrowdStrike was well aware of the impact that a similar outage would have on customers and industries in the future.

107.    On July 23, 2024, *The Verge* published a scathing article about CrowdStrike, stating, among other things, that "CrowdStrike should have caught this issue sooner. ***It's a fairly standard practice to roll out updates gradually, letting developers test for any major problems before an update hits their entire user base.*** If CrowdStrike had properly tested its content updates with a small group of users, then Friday ***would have been a wake-up call to fix an underlying***

---

[20] https://www.csoonline.com/article/3478372/crowdstrike-was-not-the-only-security-vendor-vulnerable-to-hasty-testing.html
[21] *See* 2024 10-K.

*driver problem rather than a tech disaster than spanned the globe*."[22]

108.    Following the CrowdStrike Outage, the Company has represented that it will enhance monitoring of its system and sensor performance and make efforts to guide a "phased rollout." In addition, the Company has represented that, moving forward, it will provide customers with more control over when Rapid Response Content updates are deployed so that faulty updates to not hit all computers at once when workers and IT departments are off duty.[23] These representations from CrowdStrike indicate that the Company had control over the Falcon update and that there were other feasible procedures for testing updates prior to the outage that the Company failed to implement.

109.    On August 10, 2024, the Company's president accepted the Pwnie computer award for the "most epic fail" admitting that he had attended the Pwnie Awards "[b]ecause we got this horribly wrong, we've said this a number of times, and it's super important to own it when you do things well, it's super important to own it when you do things horribly wrong."[24]

### Fallout From the CrowdStrike Outage

110.    The Company has been severely impacted as a result of the CrowdStrike Outage. On July 30, 2024, a group of investors filed the Securities Class Action in this Court, alleging violations of the federal securities laws against the Company, Defendant Kurtz, and Defendant Podbere due to misrepresentations regarding the Company's testing procedures and the efficacy

---

[22] https://www.theverge.com/2024/7/23/24204196/crowdstrike-windows-bsod-faulty-update-microsoft-responses

[23] https://arstechnica.com/information-technology/2024/07/crowdstrike-blames-testing-bugs-for-security-update-that-took-down-8-5m-windows-pcs/

[24] https://techcrunch.com/2024/08/11/crowdstrike-accepts-award-for-most-epic-fail-after-global-it-outage/

of CrowdStrike's updates.

111.    The same day, *CNN* published an article titled "Delta hires powerful lawyer David Boies' firm to seek compensation from CrowdStrike and Microsoft for its outage." In relevant part, the article stated, "Delta has hired high-profile attorney David Boies' law firm to seek damages from cyber security firm CrowdStrike and Microsoft for the massive service issues it suffered last week following a badly flawed software update that caused problems in a key computer program."[25] The article also stated that "Delta's costs could total **between \$325 million to \$475 million.**"[26]

112.    The Company has also been named as a defendant in the two Consumer Class Actions, also pending in this Court, which allege, *inter alia*, that the Company was negligent in its roll out of the faulty Falcon update.

113.    On August 29, 2024, *The Wall Street Journal* published an article titled "CrowdStrike Cuts Revenue Forecast," announcing that the Company had reduced its guidance. The article stated the following, in relevant part:

> CrowdStrike cut its outlook for the year and issued downbeat guidance for its current quarter, reflecting the impact of one of the worst computer outages ever.
>
> The cybersecurity company said Wednesday that the reduced guidance is due to more than \$60 million in incentives it is providing related to what it called customer commitment packages.
>
> \*\*\*
>
> Shares of CrowdStrike, **which have fallen nearly 23% following the outage**, dropped another 4% in the after-hours trading Wednesday, following the company's earnings call.
>
> \*\*\*
>
> The outage hit particularly hard at Delta Air Lines, which was forced to cancel about 7,000 flights during the outage. Delta has since hired the high-profile litigator

---

[25] https://www.cnn.com/2024/07/30/business/delta-boies-crowdstrike-microsoft/index.html
[26] *Id.*

David Boies to represent it as it *seeks compensation for the $500 million loss it attributed to the disruption.*[27]

**False and Misleading Statements**

*November 29, 2023 Earnings Call*

114.    On November 29, 2023, CrowdStrike hosted an earnings call with analysts and investors to discuss the Company's financial results for the third quarter of the 2024 Fiscal Year. During the call, Defendant Kurtz touted the capabilities of Falcon, representing that it "has made cybersecurity easy and effective for small businesses to the world's largest enterprises" and that the "drumbeat of innovation was loud and clear with multiple releases and announcements showcasing CrowdStrike as the XDR leader, including the Falcon platform Raptor release." He also stated that "from hygiene to patching, Falcon for IT lets customers consolidate multiple use cases and replace legacy products with our single-agent architecture," and boasted of CrowdStrike's "new Falcon Data Protection module that liberates customers from legacy [data loss prevention] products with modern, frictionless data security."

*November 29, 2023 Form 10-Q*

115.    Also on November 29, 2023, CrowdStrike filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended October 31, 2023 (the "3Q24 10-Q"). Attached to the 3Q24 10-Q were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Kurtz and Podbere certifying that the 3Q24 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [3Q24 10-Q] fairly presents, in all material respects, the financial condition and results of

---

[27] https://www.wsj.com/business/earnings/crowdstrike-cuts-guidance-in-wake-of-cyber-outage-that-hit-millions-26e832bc

operations of [the Company]."

116.    With respect to risk factors to CrowdStrike's business, the 3Q24 10-Q stated the following, in relevant part:

> ***If our solutions fail or are perceived to fail to detect or prevent incidents or have or are perceived to have defects, errors, or vulnerabilities, our brand and reputation would be harmed, which would adversely affect our business and results of operations.***
>
> Real or perceived defects, errors or vulnerabilities in our Falcon platform and cloud modules, the failure of our platform to detect or prevent incidents, including advanced and newly developed attacks, misconfiguration of our solutions, or the failure of customers to take action on attacks identified by our platform could harm our reputation and adversely affect our business, financial position and results of operations.
>
> ***
>
> ***We rely on third-party data centers, such as Amazon Web Services, and our own colocation data centers to host and operate our Falcon platform, and any disruption of or interference with our use of these facilities may negatively affect our ability to maintain the performance and reliability of our Falcon platform which could cause our business to suffer.***
>
> Our customers depend on the continuous availability of our Falcon platform. We currently host our Falcon platform and serve our customers using a mix of third-party data centers, primarily Amazon Web Services, Inc., or AWS, and our data centers, hosted in colocation facilities. Consequently, we may be subject to service disruptions as well as failures to provide adequate support for reasons that are outside of our direct control. We have experienced, and expect that in the future we may experience interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints.
>
> The following factors, many of which are beyond our control, can affect the delivery, availability, and the performance of our Falcon platform:
>
> ***
>
> •errors, defects or performance problems in our software, including third-party software incorporated in our software;
> •improper deployment or configuration of our solutions;
> •the failure of our redundancy systems, in the event of a service disruption at one of our data centers, to provide failover to other data centers in our data center network; and
> •the failure of our disaster recovery and business continuity arrangements.

The adverse effects of any service interruptions on our reputation, results of operations, and financial condition may be disproportionately heightened due to the nature of our business and the fact that our customers have a low tolerance for interruptions of any duration. Interruptions or failures in our service delivery could result in a cyberattack or other security threat to one of our customers during such periods of interruption or failure. Additionally, interruptions or failures in our service could cause customers to terminate their subscriptions with us, adversely affect our renewal rates, and harm our ability to attract new customers. Our business would also be harmed if our customers believe that a cloud-based SaaS-delivered endpoint security solution is unreliable. While we do not consider them to have been material, we have experienced, and may in the future experience, service interruptions and other performance problems due to a variety of factors. The occurrence of any of these factors, or if we are unable to rapidly and cost-effectively fix such errors or other problems that may be identified, could damage our reputation, negatively affect our relationship with our customers or otherwise harm our business, results of operations and financial condition.

(Emphasis in original).

### March 5, 2024 Earnings Call

117.    On March 5, 2024, CrowdStrike hosted an earnings call with analysts and investors to discuss its financial results for the 2024 Fiscal Year. During the call, Defendant Kurtz continued to boast of Falcon's capabilities, representing that it "is validated, tested and certified." He also emphasized the Company's "execution and discipline across the business."

### March 7, 2024 Form 10-K

118.    On March 7, 2024, CrowdStrike filed the 2024 10-K with the SEC. Defendants Kurtz, Podbere, Watzinger, Davis, O'Leary, Sullivan, Flower, Schumacher, Austin, and Gandhi signed the 2024 10-K. Attached to the 2024 10-K were SOX certifications made and signed by Defendants Kurtz and Podbere certifying that the 2024 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of

[the Company]."

119.    The 2024 10-K represented the following about the alleged "key benefits" of

CrowdStrike's business approach and the Falcon platform:

We offer our customers compelling business value that includes ease of adoption, rapid time-to-value, superior efficacy rates in detecting threats and preventing breaches, and reduced total cost of ownership by consolidating legacy, siloed, and multi-agent security products in a single solution. We also allow thinly-stretched security organizations to automate previously manual tasks, freeing them to focus on their most important objectives. With the Falcon platform, organizations can transform how they combat threats, transforming from slow, manual, and reactionary to fast, automated,
and predictive, while gaining visibility across the threat lifecycle.

Key benefits of our approach and the CrowdStrike Falcon platform include:
. . .
•High Efficacy, Low False Positives: The vast telemetry of the Security Cloud and the best practices employed in continually training our AI models results in industry-leading efficacy rates and low false positives.

•Consolidation of Siloed Products: Integrating and maintaining numerous security products creates blind spots that attackers can exploit, is costly to maintain and negatively impacts user performance. Our cloud-native platform approach gives customers a unified approach to address their most critical areas of risk seamlessly. We empower customers to rapidly deploy and scale industry leading technologies across endpoint detection and response ("EDR") and Extended Detection and Response ("XDR"), Identity Threat Protection, Threat Intelligence, Exposure Management, Cloud Security, Application Security Posture Management, Next-Generation SIEM and Modern Log Management, and IT Automation from a single platform.

•Reducing Agent Bloat: Our single intelligent lightweight agent enables frictionless deployment of our platform at scale, enabling customers to rapidly adopt our technology across any type of workload running on a variety of endpoints. The agent is nonintrusive to the end user, requires no reboots and continues to protect the endpoint and track activity even when offline. Through our single lightweight agent approach, customers can adopt multiple platform modules to address their critical areas of risk without burdening the endpoint with multiple agents. Legacy approaches often require multiple agents as they layer on new capabilities. This can severely impact user performance and create barriers to security.

•Rapid Time to Value: Our cloud-native platform was built to rapidly scale industry

- 45 -

leading protection across the entire enterprise, eliminating lengthy implementation periods and professional services engagements that next-gen and legacy competitors may require. Our single agent, collect once and re-use many times approach enables us to activate new modules in real time.

•Elite Security Teams as a Force Multiplier: As adversaries continue to employ sophisticated malwareless attacks that exploit user credentials and identities, automation and autonomous security are no longer sufficient on their own. Stopping today's sophisticated attacks requires a combination of powerful automation and elite threat hunting. Falcon Complete provides a comprehensive monitoring, management, response, and remediation solution to our customers and is designed to bring enterprise level security to companies that may lack enterprise level resources.

CrowdStrike Falcon OverWatch, part of CrowdStrike Counter Adversary Operations, combines world-class human intelligence from our elite security experts with the power of the Falcon platform. OverWatch is a force multiplier that extends the capabilities and improves the productivity of our customers' security teams. Because our world-class team can see attacks across our entire customer base, their expertise is enhanced by their constant visibility into the threat landscape. Additionally, the insights of our OverWatch team can then be leveraged by the Falcon platform to further enhance its autonomous capabilities, creating a positive feedback loop for our customers.

•Alleviating the Skills Shortage through Automation: CrowdStrike automates manual tasks to free security teams to focus on their most important job – stopping the breach. Our Falcon Fusion capability automates workflows to reduce the need to switch between different security tools and tasks, while our Falcon Insight XDR module provides a unified solution that enables security teams to rapidly and efficiently identify, hunt, and eliminate threats across multiple security domains using first and third party datasets.

•Lower Total Cost of Ownership: Our cloud-native platform eliminates our customers' need for initial or ongoing purchases of hardware and does not require their personnel to configure, implement or integrate disparate point products. Additionally, our comprehensive platform reduces overall personnel costs associated with ongoing maintenance, as well as the need for software patches and upgrades for separate products.

Our research and development organizations are responsible for the design, architecture, operation and quality of our cloud native Falcon platform. In addition, the research and development organizations work closely with our customer success teams to promote customer satisfaction.

Our success is a result of our continuous drive for innovation. Our internal team of security experts, researchers, intelligence analysts, and threat hunters continuously analyzes the evolving global threat landscape to develop products that defend against today's most sophisticated and stealthy attacks and report on emerging security issues. We invest substantial resources in research and development to enhance our Falcon platform, and develop new cloud modules, features and functionality. We believe timely development of new, and enhancement of our existing products, services, and features is essential to maintaining our competitive position. We work closely with our customers and channel partners to gain valuable insight into their security management practices to assist us in designing new cloud modules and features that extend the capability of our platform. Our technical staff monitors and tests our software on a regular basis, and we also make our Falcon platform available for third-party validation. We also maintain a regular release process to update and enhance our existing solutions. In addition, we engage security consulting firms to perform periodic vulnerability analysis of our solutions.

…

Our cybersecurity risk management program, which includes data privacy, product security, and information security, is designed to align with our industry's best practices.

120.    With respect to CrowdStrike's risk factors, the 2024 10-K stated:

***If our solutions fail or are perceived to fail to detect or prevent incidents or have or are perceived to have defects, errors, or vulnerabilities, our brand and reputation would be harmed, which would adversely affect our business and results of operations.***

Real or perceived defects, errors or vulnerabilities in our Falcon platform and cloud modules, the failure of our platform to detect or prevent incidents, including advanced and newly developed attacks, misconfiguration of our solutions, or the failure of customers to take action on attacks identified by our platform could harm our reputation and adversely affect our business, financial position and results of operations.

…

***We rely on third-party data centers, such as Amazon Web Services, and our own colocation data centers to host and operate our Falcon platform, and any disruption of or interference with our use of these facilities may negatively affect our ability to maintain the performance and reliability of our Falcon platform which could cause our business to suffer.***

Our customers depend on the continuous availability of our Falcon platform. We currently host our Falcon platform and serve our customers using a mix of third-party data centers, primarily Amazon Web Services, Inc., or AWS, and our data centers, hosted in colocation facilities. Consequently, we may be subject to service

disruptions as well as failures to provide adequate support for reasons that are outside of our direct control. We have experienced, and expect that in the future we may experience interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints.

The following factors, many of which are beyond our control, can affect the delivery, availability, and the performance of our Falcon platform:
…
•errors, defects or performance problems in our software, including third-party software incorporated in our software;
•improper deployment or configuration of our solutions;
•the failure of our redundancy systems, in the event of a service disruption at one of our data centers, to provide failover to other data centers in our data center network; and
•the failure of our disaster recovery and business continuity arrangements.
The adverse effects of any service interruptions on our reputation, results of operations, and financial condition may be disproportionately heightened due to the nature of our business and the fact that our customers have a low tolerance for interruptions of any duration. Interruptions or failures in our service delivery could result in a cyberattack or other security threat to one of our customers during such periods of interruption or failure. Additionally, interruptions or failures in our service could cause customers to terminate their subscriptions with us, adversely affect our renewal rates, and harm our ability to attract new customers. Our business would also be harmed if our customers believe that a cloud-based SaaS-delivered endpoint security solution is unreliable. While we do not consider them to have been material, we have experienced, and may in the future experience, service interruptions and other performance problems due to a variety of factors. The occurrence of any of these factors, or if we are unable to rapidly and cost-effectively fix such errors or other problems that may be identified, could damage our reputation, negatively affect our relationship with our customers or otherwise harm our business, results of operations and financial condition.

(Emphasis in original).

### *March 7, 2024 Morgan Stanley Technology, Media & Telecom Conference*

121.    Also on March 7, 2024, Defendant Kurtz attended the Morgan Stanley Technology, Media & Telecom Conference, where he represented that it was "friction-free to deploy [CrowdStrike's product]."

122.    The statements in ¶¶114-121 above were materially false and misleading because

- 48 -

they failed to disclose, *inter alia*, that: (1) CrowdStrike and the Individual Defendants were participating in the Software Testing Misconduct; (2) due to the Software Testing Misconduct, there was a significant risk that an update to Falcon could cause major outages for a substantial portion of CrowdStrike's customers; and (3) such outages made CrowdStrike vulnerable to substantial reputational harm and legal risk, which risks eventually materialized as a result of the CrowdStrike Outage. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

123.    On May 6, 2024, CrowdStrike filed the 2024 Proxy Statement with the SEC. Defendants Kurtz, Austin, Davis, Flower, Gandhi, O'Leary, Schumacher, Sullivan, and Watzinger solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

124.    The 2024 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Austin, Gandhi, and Watzinger to the Board; (2) the ratification of the selection of PricewaterhouseCoopers LLP as CrowdStrike's independent registered public accounting firm for its fiscal year ending January 31, 2025; and (3) the approval, on an advisory basis, of the compensation of CrowdStrike's named executive officers.

125.    With respect to the "Role of the Board in Risk Oversight," the 2024 Proxy Statement stated the following:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, cybersecurity, legal and compliance, and reputational risks, in the pursuit and achievement of our strategic objectives. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and compliance, cybersecurity, and financial risks,

- 49 -

while our Board, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our Company is exposed, as well as foster a corporate culture of integrity. Consistent with this approach, our Board regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team at each regular board meeting. Our Board also receives regular reports on all significant committee activities at each regular board meeting and evaluates the risks inherent in significant transactions.

In addition, our Board has tasked designated standing committees with oversight of certain categories of risk management. Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk assessment and risk management, including the Company's policies and practices pertaining to financial accounting, investment, tax, and cybersecurity matters, and discusses with management the Company's major financial risk exposures. Our Compensation Committee reviews and assesses risks arising from the Company's employee compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on the Company. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines and policies. Our Transaction Committee reviews and evaluates certain risks related to potential acquisitions of businesses, entities or technologies.

Our Board believes its current leadership structure supports the risk oversight function of the Board.

126.    Regarding the Code of Ethics, the 2024 Proxy Statement stated the following:

Our Board has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates, including independence standards, and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a Code of Business Conduct and Ethics that applies to all our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer and other executive and senior financial officers. The full text of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics are posted on our website at ir.crowdstrike.com. We will post amendments to our Code of Business Conduct and Ethics or any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website or in filings under the Exchange Act.

127.    Under the direction and watch of Defendants Kurtz, Austin, Davis, Flower, Gandhi, O'Leary, Schumacher, Sullivan, and Watzinger, the 2024 Proxy Statement was materially false

and misleading and failed to disclose, *inter alia*, that: (1) CrowdStrike and the Individual Defendants were participating in the Software Testing Misconduct; (2) due to the Software Testing Misconduct, there was a significant risk that an update to Falcon could cause major outages for a substantial portion of CrowdStrike's customers; and (3) such outages made CrowdStrike vulnerable to substantial reputational harm and legal risk, which risks eventually materialized as a result of the CrowdStrike Outage. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

128.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were (a) causing or permitting the Company to issue false and misleading statements and (b) participating in and/or facilitating the Company's participation in the Software Testing Misconduct.

129.    As a result of Defendants Kurtz, Austin, Davis, Flower, Gandhi, O'Leary, Schumacher, Sullivan, and Watzinger causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Austin, Gandhi, and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike.

**June 5, 2024 10-Q**

130.    On June 5, 2024, the Company filed a Form 10-Q with the SEC reporting its

financial and operational results for the first quarter of fiscal year 2025 ended April 30, 2024 (the "1Q25 10-Q"). Attached to the 1Q25 10-Q were SOX certifications made and signed by Defendants Kurtz and Podbere certifying that the 1Q25 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [1Q25 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

131.   With respect to risk factors to CrowdStrike's business, the  1Q25 10-Q stated:

***If our solutions fail or are perceived to fail to detect or prevent incidents or have or are perceived to have defects, errors, or vulnerabilities, our brand and reputation would be harmed, which would adversely affect our business and results of operations.***

Real or perceived defects, errors or vulnerabilities in our Falcon platform and cloud modules, the failure of our platform to detect or prevent incidents, including advanced and newly developed attacks, misconfiguration of our solutions, or the failure of customers to take action on attacks identified by our platform could harm our reputation and adversely affect our business, financial position and results of operations.

…

***We rely on third-party data centers, such as Amazon Web Services, and our own colocation data centers to host and operate our Falcon platform, and any disruption of or interference with our use of these facilities may negatively affect our ability to maintain the performance and reliability of our Falcon platform which could cause our business to suffer.***

Our customers depend on the continuous availability of our Falcon platform. We currently host our Falcon platform and serve our customers using a mix of third-party data centers, primarily Amazon Web Services, Inc., or AWS, and our data centers, hosted in colocation facilities. Consequently, we may be subject to service disruptions as well as failures to provide adequate support for reasons that are outside of our direct control. We have experienced, and expect that in the future we may experience interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints.

The following factors, many of which are beyond our control, can affect the

delivery, availability, and the performance of our Falcon platform:

…

•errors, defects or performance problems in our software, including third-party software incorporated in our software;
•improper deployment or configuration of our solutions;
•the failure of our redundancy systems, in the event of a service disruption at one of our data centers, to provide failover to other data centers in our data center network; and
•the failure of our disaster recovery and business continuity arrangements.

The adverse effects of any service interruptions on our reputation, results of operations, and financial condition may be disproportionately heightened due to the nature of our business and the fact that our customers have a low tolerance for interruptions of any duration. Interruptions or failures in our service delivery could result in a cyberattack or other security threat to one of our customers during such periods of interruption or failure. Additionally, interruptions or failures in our service could cause customers to terminate their subscriptions with us, adversely affect our renewal rates, and harm our ability to attract new customers. Our business would also be harmed if our customers believe that a cloud-based SaaS-delivered endpoint security solution is unreliable. While we do not consider them to have been material, we have experienced, and may in the future experience, service interruptions and other performance problems due to a variety of factors. The occurrence of any of these factors, or if we are unable to rapidly and cost-effectively fix such errors or other problems that may be identified, could damage our reputation, negatively affect our relationship with our customers or otherwise harm our business, results of operations and financial condition.

(Emphasis in original).

132.    The statements in ¶¶130-131 above were materially false and misleading because they failed to disclose, *inter alia*, that: (1) CrowdStrike and the Individual Defendants were participating in the Software Testing Misconduct; (2) due to the Software Testing Misconduct, there was a significant risk that an update to Falcon could cause major outages for a substantial portion of CrowdStrike's customers; and (3) such outages made CrowdStrike vulnerable to substantial reputational harm and legal risk, which risks eventually materialized as a result of the CrowdStrike Outage. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

133.    The truth began to emerge on July 19, 2024, when it was publicly revealed that a flawed content update for Falcon, specifically in the program's Rapid Response Content file, caused severe worldwide technology outages for millions of devices using Microsoft Windows. The CrowdStrike Outage impacted approximately 8.5 million Windows devices, and victims of the outage included both government entities and large corporations. Due to the outage, airlines were forced to ground numerous flights, and emergency 911 hotlines were inoperable, among other consequences.  In addition, the Company warned the public that bad actors were attempting to exploit the CrowdStrike Outage as a means of hacking Company customers.

134.    On this news, the price per share of CrowdStrike's stock fell $38.09, or 11%, from a closing price of $343.05 per share on July 18, 2024 to close at a price of $304.96 per share on July 19, 2024.

135.    The truth continued to come to light on July 22, 2024 when news emerged that Congress had contacted Defendant Kurtz to testify regarding the CrowdStrike Outage. The same day, analysts such as Guggenheim and BTIG downgraded CrowdStrike's stock rating.

136.    On this news, the price per share of CrowdStrike's stock fell $41.05, or 13.5%, from a closing price of $304.96 per share on July 19, 2024 to close at $263.91 on July 22, 2024.

137.    The truth fully came to light on July 29, 2024 when news emerged that Delta Air Lines had employed renowned attorney David Boies to seek damages from CrowdStrike as a result of the CrowdStrike Outage.

138.    On this news, the price per share of CrowdStrike's stock fell $25.16, or 10%, from a closing price of $258.81 on July 29, 2024 to close at $233.65 per share on July 30, 2024.

139.    In the weeks following the CrowdStrike outage, the insufficient precautions taken by CrowdStrike with regard to its updates continued to come to light. For example, *The Verge* reported that the testing CrowdStrike did on its Rapid Response Content updates appeared to not be as thorough as the testing the Company had done on other updates. Indeed, *The Verge* quoted an expert who acknowledged that "[i]f CrowdStrike had properly tested its content updates," the CrowdStrike Outage would likely not have happened. Similarly, an expert cited by *The Washington Post* represented that it was "alarming" that the Company update was not "tested and validated" before it was implemented.

## DAMAGES TO CROWDSTRIKE

140.    As a direct and proximate result of the Individual Defendants' conduct, CrowdStrike has lost and expended, and will continue to lose and expend, many millions of dollars.

141.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

142.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Consumer Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the Software Testing Misconduct, including the anticipated lawsuit by Delta Air Lines for damages estimating approximately $500 million, and any other misconduct alleged herein, and amounts paid to outside lawyers, accountants, and

investigators in connection thereto.

144.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Software Testing Misconduct.

145.    Such expenditures also include any losses incurred as a result of the CrowdStrike Outage.

146.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

147.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

148.    As a direct and proximate result of the Individual Defendants' conduct, CrowdStrike has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

149.    Plaintiff brings this action derivatively and for the benefit of CrowdStrike to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CrowdStrike, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

150.    CrowdStrike is named solely as a nominal party in this action. This is not a collusive

action to confer jurisdiction on this Court that it would not otherwise have.

151.    Plaintiff is, and has been at all relevant times, a shareholder of CrowdStrike. Plaintiff will adequately and fairly represent the interests of CrowdStrike in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY**

152.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

153.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following nine individuals: Defendants Kurtz, Austin, Davis, Flower, Gandhi, O'Leary, Schumacher, Sullivan, and Watzinger (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of these nine Director-Defendants.

154.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Software Testing Misconduct, and to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

155.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage the Software Testing

Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

156.    Additional reasons that demand on Defendant Kurtz is futile follow. Defendant Kurtz has served as CrowdStrike's President and CEO and as a Company director since November 2011. As such, the Company provides Defendant Kurtz with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Kurtz is a non-independent director. As CrowdStrike's CEO and as one of its trusted directors, Defendant Kurtz was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally signed and for which he made SOX certifications. As a trusted Company director, Defendant Kurtz conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Kurtz signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Austin, Gandhi, and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. Further, Defendant Kurtz's insider sales,

made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes. Moreover, Defendant Kurtz is named as a defendant in the Securities Class Action. For these reasons, Defendant Kurtz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Austin is futile follow. Defendant Austin has served as a Company director since September 2018. She also serves as Chair of the Audit Committee. Defendant Austin has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Austin signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendants Gandhi and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. Further, Defendant Austin's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the schemes. For these reasons, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Davis is futile follow. Defendant

Davis has served as a Company director since July 2013. He also serves as a member of the Compensation Committee. Defendant Davis has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Davis signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Austin, Gandhi and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. For these reasons, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Flower is futile follow. Defendant Flower has served as a Company director since January 2023. Defendant Flower has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Flower signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading

statements and resulted in, *inter alia*, the re-election of Defendants Austin, Gandhi and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. For these reasons, Defendant Flower breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Gandhi is futile follow. Defendant Gandhi has served as a Company director since August 2013. He also serves as Chair of the Compensation Committee and as a member of the Transaction Committee. Defendant Gandhi has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Gandhi signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Austin and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. For these reasons, Defendant Gandhi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant O'Leary is futile follow. Defendant O'Leary has served as a Company director since December 2011. He also serves as Chair of the

Nominating and Corporate Governance Committee. Defendant O'Leary has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant O'Leary signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Austin, Gandhi and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. Further, Defendant O'Leary's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes. For these reasons, Defendant O'Leary breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Schumacher is futile follow. Defendant Schumacher has served as a Company director since November 2020. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Schumacher has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over

reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Schumacher signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Austin, Gandhi and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. For these reasons, Defendant Schumacher breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Sullivan is futile follow. Defendant Sullivan has served as a Company director since December 2017. He also serves as a member of the Audit Committee. Defendant Sullivan has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Sullivan signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Austin, Gandhi and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. For these reasons, Defendant Sullivan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Watzinger is futile follow. Defendant Watzinger has served as a Company director since April 2012. He also serves as a member of the Audit Committee, Nominating and Corporate Governance Committee, and Transaction Committee. Defendant Watzinger has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Software Testing Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Watzinger signed the 2024 10-K, which contained false and misleading statements, and solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Austin and Gandhi to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike. For these reasons, Defendant Watzinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on the Board is futile follow.

166.    Defendants Austin, Sullivan, and Watzinger (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading

statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

167. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the schemes to cause the Company to engage in the Software Testing Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to prevent the Company from participating in the Software Testing Misconduct, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

168. CrowdStrike has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for CrowdStrike any part of the damages CrowdStrike suffered and will

continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

169.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

170.    The acts complained of herein constitute violations of fiduciary duties owed by CrowdStrike's officers and directors, and these acts are incapable of ratification.

171.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CrowdStrike. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of CrowdStrike, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

172.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause CrowdStrike to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

173.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

176.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

177.    Under the direction and watch of Defendants Kurtz, Austin, Davis, Flower, Gandhi, O'Leary, Schumacher, Sullivan, and Watzinger, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) CrowdStrike and the Individual Defendants were participating in the Software Testing Misconduct; (2) due to the Software Testing Misconduct, there was a significant risk that an update to Falcon could cause major outages for a substantial portion of CrowdStrike's customers; and (3) such outages made CrowdStrike vulnerable to substantial reputational harm and legal risk, which risks eventually materialized as a result of the CrowdStrike Outage. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

178.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were (a) causing or permitting the Company to issue false and misleading statements and (b) participating in and/or facilitating the Company's participation in the Software Testing Misconduct.

179.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the election of the Company's directors.

180.    As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Austin, Gandhi, and Watzinger to the Board, thereby allowing them to continue breaching their fiduciary duties to CrowdStrike; and (2) approve the selection of PricewaterhouseCoopers LLP as CrowdStrike's independent registered public accounting firm for its fiscal year ending January 31, 2025.

181.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

182.    Plaintiff, on behalf of CrowdStrike, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

183.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CrowdStrike's business and affairs.

185.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

186.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CrowdStrike.

187.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about CrowdStrike's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) CrowdStrike and the Individual Defendants were participating in the Software Testing Misconduct; (2) due to the Software Testing Misconduct, there was a significant risk that an update to Falcon could cause major outages for a substantial portion of CrowdStrike's customers; and (3) such outages made CrowdStrike vulnerable to substantial reputational harm and legal risk, which risks eventually materialized as a result of the CrowdStrike Outage. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

188.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Software Testing Misconduct.

189.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

190.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

191.    In yet further breach of their fiduciary duties, during the Relevant Period, five of the Individual Defendants engaged in lucrative insider sales, netting proceeds of ***over $195.5***

*million*.

192.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, including the Software Testing Misconduct, and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CrowdStrike's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

193.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, CrowdStrike has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff, on behalf of CrowdStrike, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their wrongful acts, violations of law, and false and misleading statements and

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CrowdStrike.

198.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from CrowdStrike that was tied to the performance or artificially inflated valuation of CrowdStrike, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

199.    Plaintiff, as a shareholder and representative of CrowdStrike, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

200.    Plaintiff, on behalf of CrowdStrike, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CrowdStrike, for which they are legally responsible.

203.    As a direct and proximate result of the Individual Defendants' abuse of control, CrowdStrike has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, CrowdStrike

has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff, on behalf of CrowdStrike, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

205.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CrowdStrike in a manner consistent with the operations of a publicly held corporation.

207.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CrowdStrike has sustained and will continue to sustain significant damages.

208.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff, on behalf of CrowdStrike, has no adequate remedy at law.

### SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused CrowdStrike to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

212.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

213.    Plaintiff, on behalf of CrowdStrike, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendant Kurtz and Defendant Podbere for Contribution Under Sections 10(b) and 21D of the Exchange Act**

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    CrowdStrike and Defendants Kurtz and Podbere are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Kurtz's and Defendant Podbere's willful and/or reckless violations of their obligations as officers of CrowdStrike.

216.    Defendants Kurtz and Podbere, because of their positions of control and authority as officers of CrowdStrike, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of CrowdStrike, including the wrongful acts complained of herein and in the Securities Class Action.

217.    Accordingly, Defendants Kurtz and Podbere are liable under 15 U.S.C § 78j(b),

which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act

218.    As such, CrowdStrike is entitled to receive all appropriate contribution or indemnification from Defendants Kurtz and Podbere.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of CrowdStrike, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CrowdStrike;

(c)    Determining and awarding to CrowdStrike the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing CrowdStrike and the Individual Defendants to take all necessary actions to reform and improve CrowdStrike's corporate governance and internal procedures to comply with applicable laws and to protect CrowdStrike and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of CrowdStrike to nominate at least five candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding CrowdStrike restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 4, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

- 76 -

# **VERIFICATION**

I, Jordon Routh, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3 __ day of September, 2024.

Signed by:

*Jordon Routh*

1A2EAE070A00473...

Jordon Routh